UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT ACHOE<br>302 Mattawoman Way<br>Accokeek, MD 20607<br><br>*Plaintiff*,<br><br>v.<br><br>GARY GENSLER, CHAIR,<br>UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549<br><br>*Defendant.* | Case No.: 1:21-cv-01256<br><br>Jury Trial Demand |

## COMPLAINT

Plaintiff Robert Achoe, by and through counsel, hereby files this Complaint for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a., against Defendant Gary Gensler, Chair, United States Securities and Exchange Commission, and for his Complaint states as follows.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331, 42 U.S. C. § 2000e, *et seq.*, and 29 U.S.C. § 633a.

2.  Plaintiff has exhausted all administrative remedies prior to filing suit.

3.  Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

1

**PARTIES**

4. Plaintiff Robert Achoe (hereinafter "Plaintiff", "Plaintiff Achoe", or "Mr. Achoe") is an African American male, born in August 1962 and was 52 years old at the time of the events giving rise to this Complaint.

5. Defendant Gary Gensler (hereinafter "Defendant", "SEC", or the "Agency") is the Chair of the United States Securities and Exchange Commission, an administrative agency of the United States government and an employer within the meaning of the statutes under which Plaintiff brings his claims.

**FACTS**

6. Plaintiff Robert Achoe began employment at the United States Securities and Exchange Commission in 2004 as a Paralegal Specialist, SK-12. In November 2011, Plaintiff Achoe transferred to the position of Management and Program Analyst in the Continuity of Operations Program ("COOP") at the SK-12 level in the Office of Security Services ("OSS"), Office of Support Operations. Plaintiff Achoe was the first fulltime employee in the program. In this new position, Plaintiff Achoe reported to William Fagen, Chief of the Office of Security Services.

7. In August 2013, Plaintiff's then-Chief of Security Services, Cedric Drawhorn, informed Chief Human Resources Officer, the Office of Human Resources, about the need for a formal position description for a Continuity Specialist for Plaintiff that was parallel to a Management and Program Analyst position description that Plaintiff had transferred into in November 2011. In the fall of 2013, the position description was assigned the position description ("PD") number SEC0478S, Management and Program Analyst. In the spring of 2015, the then Chief of Security Services, Kelly Gibbs, a Caucasian female in her thirties, coordinated with: Barry

Walters, Director, Office of Support Operations; Iris Rossiter, an Attorney Advisor for Office of Human Resources, Employee Relations; and a member of the "position classification section" located within the Office of Human Resources, the Plaintiff's PD. In July 2015, Plaintiff received a Full Performance Level position description assigned with a new PD number: SEC0478X00, Management and Program Analyst, SK-0343-12, Full Performance Level. Plaintiff never agreed to any determination on what the full performance level would be for his position because he was the first official fulltime employee assigned to the U.S. Securities and Exchange Commission, Office of Support Operations, Office of Security Services, Continuity of Operations Program ("COOP").

8. On July 2, 2013, Plaintiff Achoe completed a background investigation for his position as a Program and Management Analyst (his actual job title was "Management and Program Analyst") with the SEC. The background investigation included a credit report that disclosed delinquent debts.

9. On November 27, 2013, Plaintiff Achoe provided to the Agency (Office of Personnel Security) a copy of an "Approved – Trial Modification Plan" letter from his mortgage company. This letter provided detailed information concerning "Final – Loan Modification Approval." The loan modification notice was presented to then-Office of Security Personnel, Personnel Security Specialist, Kelly Gibbs, who was promoted to a management role in February 2015 and became Plaintiff Achoe's second-line supervisor. Upon submission of the approved Trial Modification Plan letter, Kelly Gibbs demanded to see the final Loan Modification Agreement for Plaintiff and his wife, which detailed his mortgage loan schedule, payment amount, and interest rates. Plaintiff Achoe responded to Ms. Gibbs: "Please show me the SEC Financial Regulation or SEC Policy that entitles you, as a member of Personnel Security, to see that level of detail because

I want to read it for myself." Ms. Gibbs was unable to produce such a regulation, rule, or policy because it does not exist within the SEC nor the Office of Personnel Management. Plaintiff Achoe informed Ms. Gibbs she was not going to get to see the actual Loan Modification Agreement because neither she nor Personnel Security was entitled to that information. Plaintiff Achoe and Ms. Gibbs went to then-Chief of Security Services, Cedric Drawhorn, to discuss the matter. Mr. Drawhorn suggested to Plaintiff Achoe that Plaintiff Achoe provide Ms. Gibbs the additional information she requested to finalize the background investigation, and Plaintiff Achoe informed Mr. Drawhorn that just as soon as she produced the regulation, rule, or policy that entitled her to that information, he would gladly provide the requested information. Mr. Drawhorn then disclosed, as a former Personnel Security Specialist himself, that no such regulation, rule, or policy existed. After additional conversation with Mr. Drawhorn, Plaintiff Achoe provided Ms. Gibbs the requested information. Ms. Gibbs was upset that she was proven to be incorrect in her demand for Plaintiff Achoe's financial information and for exposing the illegitimacy of the Financial Watch program she attempted to impose on Plaintiff Achoe. Ms. Gibbs kept Plaintiff Achoe on the illegal Financial Watch for the next 12 months. While on the Financial Watch program, Plaintiff Achoe had to provide proof of monthly payments to the loan servicing company, and Ms. Gibbs conducted a credit inquiry monthly for each of the next 12 months, thereby negatively impacting/affecting Plaintiff Achoe's credit score. Ms. Gibbs singled Plaintiff Achoe out for discriminatory treatment as an African American male by requiring him to submit to a Financial Watch program to which Caucasian employees were not required to submit.

10. In 2014, Plaintiff Achoe was diagnosed with high blood pressure and high cholesterol. Plaintiff Achoe's doctor had prescribed two medications to treat the two medical conditions. One of the key side effects of one medication causes drowsiness/dizziness when taken,

4

depending on other additional medical factors. One afternoon, during Plaintiff Achoe's lunch hour, he administered his daily dose of medication, which caused Plaintiff Achoe to briefly doze off in his chair located in his office. Once Plaintiff Achoe realized he had dozed off (for approximately one to two minutes), Plaintiff Achoe gathered his composure and noticed that a Physical Security Branch contractor was standing outside his office window laughing and taking a photo of him in his office utilizing a smart phone. Plaintiff Achoe informed the contractor that taking pictures like that was not a laughing matter. The contractor turned towards Plaintiff Achoe and stated: "It was to me." Another contractor let out a simple laugh when he heard his office mate's response to Plaintiff Achoe. Plaintiff Achoe informed both contractors of his medical condition and of the medication that he had been prescribed. Plaintiff Achoe went on to explain to both of them, if they ever see him in his office looking like that, to please come in and check to ensure that he is okay medically. Plaintiff Achoe then proceeded to inform the then-Chief of Security Services, Cedric Drawhorn, what happened. Mr. Drawhorn informed contractors that taking photos of someone without their consent was strictly prohibited. Mr. Drawhorn assured Plaintiff Achoe that he would speak to their Contracting Officer Technical Representative ("COTR"), Cedric Watson, Office of Security Services, Physical Security Branch Chief. Following this incident, Plaintiff Achoe received a report that Ms. Gibbs stated or suggested to management officials that he threatened the contractors.

11. In October 2015, Plaintiff Achoe began reporting to Tawana Harris, Office of Security Services, Continuity of Operations Branch Chief, an African American female. Plaintiff Achoe and a Caucasian male both reported to Ms. Harris.

12. Shortly after Plaintiff Achoe began reporting to Ms. Gibbs, he advised her that he has a fear of flying. Occasionally, travel was required for Plaintiff Achoe's position. The continuity

5

program Plaintiff Achoe was assigned to requires team members to interact with the SEC Regional Offices which are geographically dispersed throughout the United States. On a regular and recurring schedule, Plaintiff Achoe routinely traveled to Richmond, Virginia to conduct monthly routine testing of their Critical Classified Communications Systems as required by the COOP Communications Plan Directive. Also, Plaintiff Achoe, as the Critical Communications Manager, routinely traveled to Mt. Weather, located in Blueridge, Virginia, to attend quarterly scheduled classified Communications Managers meetings. While planning a scheduled visit to a contract vendor facility located in Chicago, Illinois, Plaintiff Achoe informed Ms. Gibbs of his fear of flying and requested alternative means of travel. Ms. Gibbs did not believe that Plaintiff Achoe had a legitimate fear of flying and denied his requests to ride Amtrak and Ms. Gibbs denied Plaintiff Achoe's request for him to drive his personally owned vehicle ("POV"). Ms. Gibbs mentioned the amount of money that Plaintiff Achoe would be reimbursed for making the drive and how it exceeded the cost of a roundtrip airplane ticket. Plaintiff Achoe then offered to sign a waiver for the reimbursed cost above the cost of a round trip ticket. Plaintiff Achoe also offered to ride Amtrak because he knew of another SEC employee assigned to the Office of Information Technology who also has a fear of flying and that employee always uses Amtrak for longer distance official government travel. Ms. Gibbs denied this request as well.

13.     In June 2016, Plaintiff was denied his request to drive or ride Amtrak to a system design meeting to be held in Chicago, Illinois. Ms. Gibbs stated that she did not feel it was in the best interest of the government for Plaintiff to drive to Chicago and requested that another employee go instead. Ms. Gibbs outlined her decision further in her email to Plaintiff and Ms. Harris seeking another person to take Plaintiff's place for the trip.

14. Plaintiff Achoe was assigned a PD/job description from August 2013 through June 2015. On June 25, 2015, Plaintiff sent two emails to Ms. Gibbs with Management and Program Analyst position descriptions attached. Later that same day, Ms. Gibbs emailed Plaintiff Achoe a new position description: SK-301-13 Emergency Preparedness Specialist. Four days later, on June 29, 2015, after realizing that the SK-301-13 Emergency Preparedness Specialist position description included a pay grade increase, Kelly Gibbs replaced the SK-301-13 position description with a completely new, rewritten SK-343-12 Management and Program Analyst PD.

15. On July 1, 2015, Ms. Gibbs contacted Michael Shepler and attached the new position description, number 0810X00, SK-0343-12, Management and Program Analyst with no career ladder or promotion potential and asked that the description be assigned to Plaintiff. Michele Sanchez and Leacha Barnette from the Human Resources office responded to Ms. Gibbs and stated they would complete the assignment of the position description to Plaintiff. Later that day, Continuity of Operations Branch Chief, Ms. Harris, emailed a copy of that position description to Plaintiff stating that it would be "issued to [him] effective today."

16. The SK-343-12 position description includes a high level of complexity, program specific responsibilities, program capability requirements, a mandatory personnel security clearance requirement (TS/SCI), along with additional program complexities and requirements. In comparison, all of Plaintiff Achoe's colleagues' position descriptions were titled as "Security Specialist"—Plaintiff was the only employee in the COOP program whose position description was not classified as a "Security Specialist." Their position descriptions did not have program specific/targeted responsibilities, a high level of complexity, nor program capability requirements. Also, neither of his program colleagues were required to obtain and maintain a personnel security clearance (TS/SCI) but, yet all of them had built-in pay grade promotions to SK-13 and a clear

opportunity for "upward mobility" and "career ladder"; all of Plaintiff's White colleagues had the potential for advancement drafted into their position descriptions despite not having the same position requirements as Plaintiff. Plaintiff's position description was specifically written to be different in many important respects from the White employees also assigned to this program. First, during the time period at issue, neither of Plaintiff's COOP colleagues, not at the SK-12/13 or SK-14 levels, were cleared at the TS/SCI clearance level. Neither of Plaintiff's White colleagues' official PD consisted of the COOP Program specific language used to describe Plaintiff's PD number, 0810X00, SK-343-12, Management and Program Analyst. Their position descriptions more accurately described the positions being staffed by the Office of Security Services, Physical Security Branch. As it pertains to "complexity of duties," it was not stated in their position descriptions that "all incumbents" must be able to participate in "[c]lassified briefings, meetings, and exercises relating to Continuity of Operations." Nor was it stated that the incumbent shall have, "[s]kill to communicate "highly complex information" to others during face-to-face meetings, by phone, or email." Their position descriptions did not state that the incumbent shall, "[a]ssist in the development, coordination, implementation and assessment of agency-wide force protection/anti-terrorism, weapons of mass destruction, mass casualty, emergency preparedness and emergency management training." Instead of providing equal opportunity, fairness, and impartiality among all team members, Kelly Gibbs colluded with other members of management to ensure that Plaintiff Achoe's new position description did not provide any possibility of "Upward Mobility" or provide a "Career Ladder" opportunity within the SEC COOP Program, Office of Security Services, or some other Division or Office within the United States Securities and Exchange Commission. The new PD drafted by Kelly Gibbs incorporated

categorically almost every programmatic role, requirement, and responsibility mandated by the SEC COOP Program without the possibility of upward mobility.

17. The new PD included, but was not limited to, the following required skills, abilities, and capabilities. Neither of Plaintiff Achoe's colleagues were required to complete any of the following duties, however both Caucasian employees had higher pay grades than Plaintiff Achoe.

**Program Management**
- Program Management Oversight and Governance
- Administrative Program Maintenance (e.g. Telework Agreements, Corrective Action Planning, Support Contracts, etc.)
- Classified Equipment or Technology Maintenance (e.g. Sensitive Compartmented Information Facility (SCIF) Custodial Access Management, Satellite Phone Maintenance)
- Classified Communication Testing Requirements (e.g. Classified Data Systems, Faxes, Documents, Satellite Phones, Secure Mobile Devices, HF/ALE, etc.)
- Emergency Notification System **(Assurance – then the COOP Program System Administrator)**
- Emergency Communications Capability Issuance and Testing (GETS and WPS) **(then the COOP Program System Administrator)**
- NC4 Alert System **(then the COOP Program System Administrator)**

**Analysis**
- Identification of Mission Essential Functions
- Business Process Analysis (BPA)
- Business Impact Analysis (BIA)
- Risk Analysis

**COOP Program Planning and Evaluation**
- Stakeholder Engagement/Teamwork
- COOP Plan Review and Updating
- COOP Plan Evaluation
- Continuity Readiness and Reporting (e.g. Monthly, Quarterly and Annual Submissions to National Security Staff, etc.)
- Test, Training and Exercise Preparation and Execution
- After Action Reporting (e.g. Lessons Learned, Corrective Action Plans and Implementation Plans, etc.)

**Emergency Site Management**
- Administrative Planning
- COOP Facility/Site Contract Oversite
- Equipment Maintenance and Inspection
- Event Response and Emergency Ready Preparedness

9

**Security Clearance Level**
- Top Secrete/Sensitive Compartmented Information (TS/SCI)

Additionally, Plaintiff Achoe had custodial access to the following Classified Data Systems.
- SEC HQs Classified Data Systems & SCIF Access
- Joint Worldwide Intelligence Communications System (JWICS) – SCI Data Network Account
- Homeland Secure Data Network (HSDN) – Secrete Data Account

COOP Facility Classified Data Systems
- Classified Data Systems & SCIF Access
- (GOLD) – SCI Data Account
- (SABER) – Secrete Data Account

18.     Included in Plaintiff's colleagues was John Rossiter (husband of Iris Rossiter), a White male who was hired as a contractor to the COOP program without any of the appropriate qualifications and granted an SK-14 equivalent position. Despite the lack of qualifications, Mr. Rossiter was granted a contractor's position without interviewing with the Program Manager of the contracting firm. Mr. Rossiter was also granted a fulltime position without any internal or external competition. Mr. Rossiter's precipitous rise through the promotional ranks only further highlights this disparity when compared to Plaintiff's twelve years of dedicated service, remaining at the SK-12 level for the entire time.

19.     Plaintiff Achoe was one of only four SEC personnel (throughout the entire SEC) certified as a Department of Homeland Security ("DHS") Homeland Secure Data Network ("HSDN") Trusted Agent; Plaintiff Achoe was one of only three SEC personnel (throughout the entire SEC) qualified to conduct Title Globe Communications Testing; Plaintiff Achoe was one of only six SEC personnel (throughout the entire SEC) qualified to be granted custodial access to the SEC HQs SCIF and the COOP Facility SCIF; Plaintiff Achoe was the only Contract Officers Technical Representative ("COTR") managing 100% of SEC COOP Program support contracts.

20.  In the morning hours of February 18, 2016, Ms. Harris was in the office talking to another team member who sat in the office across from Plaintiff Achoe. Ms. Harris overheard a phone conversation Plaintiff Achoe was having with an internal stakeholder. Once Ms. Harris finished her conversation with the team member, she entered Plaintiff Achoe's office and asked him (in a whisper) to whom was he speaking. After Plaintiff Achoe identified who was on the call, Ms. Harris proceeded to inform Plaintiff Achoe (in a sharp tone of voice) that the person that Plaintiff Achoe was having the phone conversation with was fully aware of that individual's responsibilities as the Continuity Coordinator for the Office of Support Operations, and that Ms. Harris had informed Plaintiff Achoe of the clarification made to the person previously by Plaintiff Achoe's supervisor, and there was no reason for Plaintiff Achoe to have a conversation with the person in regards to this issue. Plaintiff Achoe had no issue with Ms. Harris correcting him about the unnecessary clarification phone conversation, however, Plaintiff Achoe did take offense to Ms. Harris's tone of voice. In response, Plaintiff Achoe stated to Ms. Harris (in a firm voice) that: "I'm not your child." Plaintiff Achoe's office door was open, and a couple of employees heard the conversation between Ms. Harris and Plaintiff Achoe and went to inform Ms. Gibbs.

21.  Ms. Gibbs initially had a meeting with Ms. Harris, and then Ms. Gibbs and Ms. Harris and Plaintiff Achoe had a group meeting to discuss what happened. During the meeting, both Ms. Harris and Plaintiff apologized for the incident and informed Ms. Gibbs that behavior would not occur again. At the conclusion of the conversation, Plaintiff Achoe was under the impression that the matter was resolved.

22.  On February 19, 2016, Ms. Harris met with Plaintiff for "informal counseling" to discuss the incident and put the issue behind them. That same day, Ms. Harris emailed Ms. Gibbs apologizing again and reiterating that neither she nor Plaintiff would, "conduct [themselves] in

that manner again." Ms. Harris further elaborated that she did not, "feel threatened or intimidated by [Plaintiff's] demeanor during the conversation" and that she and Plaintiff had spoken already regarding the issue.

23. On February 28, 2016, twelve days later, Plaintiff Achoe was informed by Kelly Gibbs (witnessed by Vicki Clancy, Office of Security Services, Personnel Security Branch Chief) that he was receiving a Letter of Reprimand. Ms. Gibbs informed Plaintiff Achoe that the reason he was receiving the Letter of Reprimand was for speaking loudly to his supervisor and being disruptive to the office. Additionally, Kelly Gibbs decided to issue Plaintiff Achoe a two-year Letter of Reprimand on a day when she knew that Ms. Harris would not be in the office to possibly disagree with the action. Instead of allowing this situation to be resolved at that point or seeking guidance from another supervisor, Ms. Gibbs issued Plaintiff a Letter of Reprimand that would remain in his official personnel file for two years. The Letter was issued without a formal interview being conducted or other management officials being consulted. Ms. Harris received no reprimand for her actions. Plaintiff Achoe notified Ms. Gibbs that he totally disagreed with her characterization of the conversation between him and Ms. Harris. The Letter grossly mischaracterized the situation by stating that Plaintiff was, "yelling at [his] supervisor and causing a workplace disruption." In addition, the letter stated that if, "[Plaintiff] engaged in the same or similar misconduct again [he] may be subject to... removal." Plaintiff explained to Ms. Gibbs that two years was a disproportionate length of time for a minor disagreement. Plaintiff Achoe reiterated to Ms. Gibbs that all he did on the day in question was simply inform Ms. Harris that: "I was not her child." Plaintiff Achoe was advised that he could be terminated if the Agency determined that there was a similar incident within a year.

24. In or around August 2016, Plaintiff Achoe told his supervisor, Ms. Harris, what was occurring, Ms. Harris initially had some reluctance in believing what Plaintiff Achoe was describing to her as happening to him.

25. In September 2016, one of Plaintiff Achoe's colleagues informed Plaintiff Achoe that he witnessed/observed the Chief (Kelly Gibbs), other management employees, and fulltime employees, as well as various contractors monitoring and eavesdropping on Plaintiff Achoe's personal phone conversations and meetings with various stakeholders held in Plaintiff Achoe's office. Plaintiff Achoe was informed by Brian Williams, his then-new coworker, that he had witnessed this activity on various occasions and that he asked Ms. Harris, Plaintiff Achoe's supervisor, if there was something going on that he should be aware of. Plaintiff Achoe was informed by Ms. Harris that Mr. Williams had witnessed this activity on several occasions.

26. In October 2016, Plaintiff Achoe's supervisor prepared an annual performance appraisal for him and a Caucasian male whom she supervised and submitted both evaluations to Kelly Gibbs. Ms. Gibbs responded by arbitrarily lowering Plaintiff Achoe's evaluation but did not change the evaluation of the Caucasian male employee.

27. In December 2016, Ms. Gibbs initiated a second investigation of Plaintiff Achoe and Ms. Harris, again falsely accusing them of being disruptive in the workplace. Plaintiff Achoe retained counsel and was forced to attend an interview by an attorney in the Agency's Human Resources department, Michelle Englar. Ms. Englar interviewed Plaintiff Achoe in February 2017 under a threat of discipline if he did not agree to be interviewed before March 1, 2017. The Agency was attempting to substantiate a charge of misconduct to justify taking action to terminate both Plaintiff Achoe and Ms. Harris within one year of the prior discipline. Because the allegations

were baseless and Plaintiff Achoe retained counsel, the Agency failed to take any further action and even failed to notify Plaintiff Achoe of the results of the investigation.

28. In June 2017, the Agency designated Aimee Primeaux, a Caucasian female, as Plaintiff Achoe and Ms. Harris' first-line supervisor and supported her efforts to have Plaintiff Achoe and Ms. Harris removed from their positions. Over a period of four months, Ms. Primeaux began harassing both Plaintiff Achoe and Ms. Harris. On June 30, 2017, Ms. Primeaux requested that Plaintiff Achoe come to her office to clarify information he had provided to her earlier in the week. After several questions to Plaintiff Achoe about questions he had already answered, Plaintiff Achoe became frustrated and commented that Ms. Primeaux did not believe anything he said. Plaintiff Achoe was threatened with discipline. The harassing and disrespectful treatment continued for four months. As late as October 2017, Ms. Primeaux continued to harass Plaintiff Achoe and falsely accused him of misconduct and insubordination each instance he attempted to respond to her false accusations against him. Ms. Primeaux harassed Ms. Harris on a daily basis and made false accusations about her performance and placed her on a Performance Improvement Plan ("PIP") after supervising her for approximately 120 days.

29. On July 2, 2019, Plaintiff Achoe was placed on a Performance Improvement Plan ("PIP") without any history of performance issues.

30. On September 18, 2019, Plaintiff Achoe received a Memorandum with the subject being "Administrative Leave" from Jorge Rosa, Branch Chief, Continuity of Operations Branch, for "Proposed Removal for Unacceptable Performance."

31. On November 5, 2019, Mr. Rosa called Plaintiff Achoe to his office. Mr. Rosa verbally informed Plaintiff Achoe about his proposed removal and terminated him. After being informed of his termination, Plaintiff Achoe was immediately escorted to his office by members

of the Physical Security Branch, informed that he had five minutes to get his personal belongings together, and then escorted from the building.

32. Plaintiff Achoe was terminated on the basis of his race and due to retaliation for his prior participation in the EEO process in which he implicated Office of Support Operations senior management officials, Office of Human Resources Employee Relations (now with the Office of General Counsel), and senior management officials located in the SEC Office of the Inspector General, incriminating them in Prohibited Personnel Practice ("PPP"), Retaliation for Whistleblowing, Retaliation for Protected Activity, Improper Personnel Actions, Nepotism, and Violations of the Veterans Preference. In addition, two other employees, an SK-17 and an SK-15 were terminated for similar reasons from the exact same unit, Office of Support Operations, Office of Security Services, Continuity of Operations Branch. Plaintiff Achoe and the two other employees are all African American, all three of them were terminated by the same senior level manager(s), and all three of them had filed formal EEO complaints alleging retaliation from the Office of Support Operations senior management officials, Office of Human Resources Employee Relations (now with the Office of General Counsel), and senior management officials located in the SEC Office of the Inspector General, incriminating them in Prohibited Personnel Practice ("PPP"), Retaliation for Whistleblowing, Retaliation for Protected Activity, Improper Personnel Actions, Nepotism, and Violations of the Veterans Preference. During the same period, Plaintiff's Caucasian male coworkers, including one who threatening a senior official with violence and others who consistently performed less work than Plaintiff, were retained.

33. On June 16, 2020, Plaintiff Achoe filed an internal EEO complaint of discrimination with the SEC.

34. On September 3, 2020, the SEC accepted Plaintiff Achoe's complaint of discrimination for investigation. The SEC later issued a final decision concluding that it did not discriminate against Plaintiff Achoe.

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. § 2000e, *et seq.*
### (Race and Color Discrimination)

35. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

36. At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

37. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

38. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race and color.

39. Defendant, in violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e, *et seq.*, knowingly and intentionally subjected Plaintiff to disparate treatment and created a hostile work environment based on his race and color by: 1) placing Plaintiff on a Performance Improvement Plan ("PIP") without any history of performance issues; and 2) terminating Plaintiff's employment.

40. As a result of such acts, Plaintiff has suffered damages.

41. Defendant had no legitimate business reason for any such acts.

42. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## COUNT II
### Violation of Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. § 2000e, *et seq.*
### (Retaliation)

43. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

44. At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

45. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

46. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual filed a complaint of discrimination.

47. Defendant, in violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e, *et seq.*, knowingly and intentionally subjected Plaintiff to retaliation and a retaliatory hostile work environment after he complained about discrimination by: 1) placing Plaintiff on a Performance Improvement Plan ("PIP") without any history of performance issues; and 2) terminating Plaintiff's employment.

48. As a result of such acts, Plaintiff has suffered damages.

49. Defendant had no legitimate business reason for any such acts.

50. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other retaliatory practices that are not yet fully known.

## COUNT III
### Violation of the Age Discrimination in Employment Act
### 29 U.S.C. § 633a
### (Age Discrimination)

51. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

52. At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

53. At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

54. The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that, in executive agencies of the United States, all personnel actions affecting employees or applicants for employment who are at least 40 years of age shall be free from discrimination based on age.

55. Defendant, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, knowingly and intentionally subjected Plaintiff to discrimination and created a hostile work environment based on his age by: 1) placing Plaintiff on a Performance Improvement Plan ("PIP") without any history of performance issues; and 2) terminating Plaintiff's employment.

56. As a result of such acts, Plaintiff has suffered damages.

57. Defendant had no legitimate business reason for any such acts.

58. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Achoe prays as follows:

A.     That the Court issue an Order declaring Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 633a, and declaring Plaintiff eligible to receive equitable and other relief;

B.     Enter judgment against Defendant;

C.     Issue a permanent injunction prohibiting Defendant from engaging in any further acts of discrimination, retaliation and interference with prospective business and contractual relationships;

D.     Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law including but not limited to back pay and front pay in amounts to be determined at trial;

E.     Order Defendant to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.     Order Defendant, individually and collectively, to pay compensatory and punitive damages, including back pay and front pay and all lost benefits, and compensatory damages for emotional distress and hardship created by the Defendant's discrimination and retaliation;

G.     Order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees and costs; and

H.     Order Defendant to pay pre-judgment and post-judgment interest as provided by law.

Date: March 6, 2021                                    Respectfully submitted,

                                                       /s/ *David A. Branch*
                                                       David A. Branch, D.C. Bar No. 438764
                                                       Law Office of David A. Branch &
                                                       Associates, PLLC
                                                       1828 L Street, N.W., Suite 820
                                                       Washington, D.C. 20036
                                                       Phone: (202) 785-2805
                                                       Fax: (202) 785-0289
                                                       Email: davidbranch@dbranchlaw.com

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims against Defendant.